J-A26042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.L.O., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1099 EDA 2021 |

Appeal from the Order Entered March 24, 2021
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2020-A0197

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.G.O., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1100 EDA 2021 |

Appeal from the Order Entered March 24, 2021
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2020-A0198

BEFORE:  BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:          **FILED JANUARY 19, 2022**

C.S. (Mother) appeals from the March 24, 2021, decrees in the Court of Common Pleas of Montgomery County involuntarily terminating her parental rights to her sons, J.L.O., born in July of 2009, and J.G.O., born in May of

2005 (collectively, the Children).[1] In addition, Mother's court-appointed counsel (Counsel), seeks to withdraw from representation pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009). Upon review, we affirm the decrees and grant counsel's petition.

We summarize the relevant facts and procedural history, as follows. Montgomery County Office of Children and Youth (OCY) has consistently been involved with this family since December 2010, when it opened a case due to concerns regarding the family's homelessness, Father having mental health issues, and Mother then being incarcerated. ***See*** N.T., 3/22/21, at 11-12. In December 2010, OCY developed a family service plan (FSP) for Father and Mother, which included ensuring supervision of the Children, obtaining medical and dental care for the Children, and maintaining safe living conditions. ***See id.*** at 14; ***see also*** Orphans' Ct. Op., 7/15/21, at 1. Mother's FSP objectives further included achieving and maintaining recovery from substance abuse, cooperating with the Montgomery County Probation Office, and resolving her legal issues. ***See*** Orphans' Ct. Op., 7/15/21, at 1-2 (citation to record omitted).

---

[1] The court also involuntarily terminated the parental rights of the Children's father, J.O (Father), but he did not appeal.

J-A26042-21

From 2011, until January 2013, Letha Kaminski, the OCY caseworker throughout this case, met with the family on a regular basis.[2] *See* N.T., 3/22/21, at 14-15. In January 2013, while the case remained open with OCY, Father became incarcerated, and Mother and the Children went to live with the Children's paternal grandmother. *See id.* at 15. In February 2013, Mother became incarcerated at Montgomery County Correctional Facility. *See id.* at 15, 17. The Children remained with their grandmother, who, upon initiating a child custody action, was awarded custody of the Children. *See id.* at 15-17. OCY continued to offer ongoing services.

By December 17, 2013, Mother had been released from prison. On that date, she met with the Children at McDonald's restaurant under Kaminski's supervision. *See* N.T., 3/22/21, at 18. J.L.O. was then four years old, and J.G.O. was eight years old. *See id.* The Children have not seen Mother since that meeting. *See id.* Likewise, the caseworker has not seen Mother since that meeting and only had phone communication with her one additional time before July 2020. *See id.* at 20.

_____

[2] During this two-year time period, Kaminski regularly met in-person with Mother and received telephone calls from her. *See* N.T., 3/22/21, at 15. As best we can discern, Mother was released from prison around the time that OCY opened its case for this family, but the certified record does not provide the date.

On May 9, 2018, OCY filed dependency petitions because the Children's grandmother became ill and was unable to continue caring for them.[3] **See** N.T., 3/22/21, at 31-32. At that time, Mother was incarcerated at Lehigh County Jail, and OCY arranged for her to be transported to the adjudicatory hearing scheduled for May 29, 2018. **See id.** at 32. However, Mother was released from prison on May 28, 2018, and she did not appear for the hearing. **See id.** Following the hearing, the trial court adjudicated the Children dependent. **See id.** at 29. The court did not remove the Children from their grandmother's home, where Father was then also residing. **See id.** at 33.

On August 14, 2018, the court placed the Children in the emergency custody of OCY because Father and the Children were residing in a hotel. **See id.** at 33-34. Further, J.G.O. developed a rash, and Father was unable to purchase the medication needed to treat it. **See id.** at 34. The Children were placed in Christ's Home in Warminster, Pennsylvania, where they remained until they were placed together in a pre-adoptive home on July 3, 2020. **See id.** at 34-35.

Between September 2018 and November 2019, permanency review hearings occurred, which Mother never attended. **See** Orphans' Ct. Op., 7/15/21, at 3 (footnote omitted). Mother's whereabouts and contact information were unknown until May 2020, when Kaminski obtained Mother's

---

[3] The Children's grandmother died on September 1, 2019. **See** N.T., 3/22/21, at 35.

telephone number, and she sent Mother a text message. *See* N.T., 3/22/21, at 20-21. On July 16, 2020, Mother telephoned Kaminski and told her that "she had been in and out of jail the last couple years." *See id.* at 21-23. Mother stated that she was released from prison in November 2019. *See id.* at 23. Mother informed Kaminski that she was residing in a one-room apartment, and she shared a bathroom and kitchen with other residents in the house. *See id.* at 22-23. After that date, Mother did not telephone the caseworker again. *See id.* at 24-25.

On December 28, 2020, OCY filed involuntary termination petitions pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b), at the Children's separate docket numbers. The orphans' court held a hearing on March 22, 2021, which was conducted *via* Zoom because of the COVID-19 pandemic.[4] OCY presented the testimony of Kaminski, and K.D., the Children's pre-adoptive foster mother.[5] Moreover, Mother testified on her own behalf.

By separate decrees dated March 22, 2021, and entered on the Children's individual dockets on March 24, 2021, the orphans' court

---

[4] The Children, then ages eleven and fifteen, were represented during the proceeding by Kyle Felty, Esquire, whom the court appointed to represent the legal interests of the Children pursuant to 23 Pa.C.S. § 2313(a). *See* Order, 2/9/21. The Children were not represented by a guardian *ad litem*.

[5] In addition, OCY introduced into evidence approximately twenty-one exhibits, which the court admitted, but they are not included in the certified record.

involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b). On April 20, 2021, Mother filed notices of appeal and concise statements of errors complained of on appeal, which this Court consolidated *sua sponte*.[6] The orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a) on July 15, 2021.

On August 12, 2021, Counsel filed a petition with this Court requesting to withdraw from representation, and she submitted a brief pursuant to **Anders** and **Santiago**. We begin by reviewing Counsel's request. **See Commonwealth v. Rojas**, 874 A.2d 638, 639 (Pa. Super. 2005) ("When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.").

This Court "extended the **Anders** principles to appeals involving the termination of parental rights." **In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014). To withdraw pursuant to **Anders**, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel

---

[6] The notices of appeal listed both of the Children's docket numbers; however, Mother complied with Pa.R.A.P. 341, as interpreted by **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), and its progeny, by filing the notices at both dockets. **See Commonwealth v. Johnson**, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*) (holding that, although each notice of appeal contained multiple docket numbers, it was "of no consequence," because the defendant complied with **Walker** by filing a separate notice at each docket).

or raise additional arguments that the [appellant] deems worthy of the court's attention.

***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted).

With respect to the third requirement of ***Anders***, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005). Here, Counsel initially failed to attach the requisite letter to her petition. Counsel subsequently timely complied with this Court's August 24, 2021, order requesting that she provide copies of the letter in accordance with ***Millisock***.

Finally, an ***Anders*** brief must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361 (paragraph breaks inserted).

Counsel in this case filed a petition to withdraw certifying her review and determination that Mother's appeal is frivolous. Counsel also filed a brief

which includes a summary of the history and facts of the case, the issues raised by Mother, the facts that arguably support the appeal, and Counsel's assessment of why the appeal is frivolous, with citations to relevant legal authority. Finally, as explained above, Counsel timely complied with this Court's order to provide copies of the letter she sent to Mother pursuant to *Millisock*. Therefore, Counsel substantially complied with the requirements of *Anders* and *Santiago*.

We next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." *Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Counsel's *Anders* brief raises claims asserting that the orphans' court committed an error of law and/or abused its discretion in concluding that OCY proved by clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b).[7] *See* OCY Brief at 7-8.

We recognize:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate

---

[7] The Children's counsel joined in the brief filed by OCY advocating for the involuntary termination decrees to be affirmed. *See* Letter of Kyle Felty, Esquire, 9/2/21.

courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and some punctuation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we address termination under Section 2511(a)(1) and (b), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

We have explained that a parent does not perform his parental duties by displaying a "merely passive interest in the development of the child." ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child

- 10 -

relationship to the best of his or her ability, even in difficult circumstances."

*Id.* (citation omitted).

With respect to how incarceration relates to termination under Section 2511(a)(1), the Pennsylvania Supreme Court in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), which involved the issue of the termination of parental rights of incarcerated persons involving abandonment, currently codified at Section 2511(a)(1).  The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child."  We observed that the father's incarceration made his performance of this duty "more difficult."

*S.P.*, 47 A.3d at 828 (citations omitted).  The *S.P.* Court continued to explain:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment.  Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration.  Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.  Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*S.P.*, 47 A.3d at 828 (citation omitted).

Finally, this Court has stated regarding Section 2511(a)(1):

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's

explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d at 730 (citation omitted).

With respect to Section 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Instantly, the orphans' court found regarding Section 2511(a)(1):

OCY had taken custody of the [C]hildren on August 14, 2018. . . . Mother was released from Lehigh County Jail on November 18, 2019. Despite numerous attempts to reach Mother by OCY caseworkers, Mother did not respond. . . . At the [termination of parental rights] hearing, Mother testified that she made attempts to contact the caseworker after being released from prison in 2019. *See* N.T., 3/22/2021, at 69.[2] However, it appears that Mother did not understand the purpose of OCY as an intermediary between her and [the C]hildren. She did not avail herself [of] OCY's services or work toward the goals necessary for reunification with [the C]hildren with genuine determination.

- 12 -

Despite Mother's freedom from incarceration during the six to twelve months prior to the filing of the [termination] petition, there was no evidence that Mother performed any parental duties within that time[-]period. In fact, the evidence showed that [M]other had no in-person contact with the [C]hildren after December [1]7, 2013[.]

_____

[2] Mother did not have her own phone number at that time and left her doctor's phone number for the caseworker to call back. *See* N.T.[, 3/22/21,] at 69. According to Mother, the caseworker did not call back. *Id.* Mother did receive Facebook messages from [the Children] in July 2020. *Id.* at 70.

Orphans' Ct. Op., 7/15/21, at 7-8. The record supports the court's findings.

Kaminski testified that, from 2011 until Mother's incarceration in February 2013, she met with Mother regularly and discussed her FSP objectives, *inter alia*, and Mother called her regularly. *See* N.T., 3/22/21, at 14-15, 19-20. Kaminski testified that when Mother was incarcerated in 2013, she knew that Kaminski was still the caseworker, and Mother had Kaminski's contact information.[8] *See id.* at 16. In fact, on March 22, 2013, Mother telephoned Kaminski from prison, after receiving notice that the Children's grandmother filed for emergency custody. *See id.* at 17. Kaminski testified on direct examination:

The phone call that Mother and I had, she received paperwork that [grandmother] had to file for emergency custody because both parents were incarcerated. And we had a discussion about [grandmother] need[ing] to file for custody and that . . . when

_____

[8] Throughout the history of this case, Kaminski's contact information did not change. *See* N.T., 3/22/21, at 21-22.

[Mother] got out [of prison], . . . if she wanted to get the [C]hildren, she would need to go to family court for custody.

*Id.* Kaminski testified that, to her knowledge, Mother never filed a petition for custody of the Children. *See id.*

Kaminski testified that she next spoke with Mother in April 2014, but she did not testify about the details of the conversation or who initiated it. *See* N.T., 3/22/21, at 20. Kaminski spoke to Mother again on July 16, 2020, as discussed above. *See id.* at 20-22. Kaminski testified on direct examination:

> Q. When you spoke with [Mother], did you address the fact that you had no contact with her in about seven years?
>
> A. Yes.
>
> Q. What did Mom say with regards to that?
>
> A. Mom did say that she did reach out. I told her that I have not received any phone calls from her. Mother did tell me that she had been discharged from prison . . . in November of 2019. And she had been in and out of jail for the last couple of years.
>
> \* \* \*
>
> Q. At the time that you spoke with her on July 16th, did you tell her that [the C]hildren have been placed in a pre-adoptive foster home?
>
> A. Yes.
>
> Q. Did she ask to see the [C]hildren?
>
> A. She did not ask to see the [C]hildren. She did say that she wanted to get her kids back.
>
> \* \* \*

- 14 -

Q. Did you say anything to her with regards to assessing her situation, given that you hadn't . . . heard from her in seven years?

A. Yes.

Q. [ ]On July 16, 2020, she was aware she needed to contact you to have contact with [the C]hildren?

A. Yes.

Q. And was she aware that she needed to contact you in order to be assessed to move forward on her case?

A. Yes.

*See id.* at 23-24.

Kaminski stated that Mother revealed during the July 16, 2020, telephone call that the Children had "reached out to her on Messenger," and she was communicating with them. *See id.* at 24. Kaminski stated on cross-examination by Mother's counsel that she had no independent information that it was the Children who initiated contact with Mother. *See id.* at 41. Kaminski explained that she discussed with Mother that she needed "to assess her further and . . . that the [C]hildren block[ed] her phone number" because she needed to supervise any communication by Mother with them. *See id.* at 24. On cross-examination by Mother's counsel, Kaminski clarified that she directed the Children to block Mother. *See id.* at 41. On cross-examination by the Children's counsel, Kaminski testified that she needed to supervise the communication between Mother and the Children, in part, "[d]ue to them not seeing her since 2013, a lot has happened. And I just wanted to try to make

sure I was protecting them and just ensuring that they were safe in the situation." **See id.** at 46.

Kaminski testified that after the telephone conversation on July 16, 2020, Mother never contacted her again. **See id.** at 24-25. Kaminski stated that she telephoned and texted Mother on August 17, 2020, but received no response. **See id.** at 25. The "family engagement unit" at OCY then attempted to contact Mother *via* Facebook Messenger on October 13, 2020, January 29, 2021, and March 11, 2021, also to no avail. **See id.** at 27-28.

Mother testified on direct examination regarding her attempts to contact Kaminski, as follows:

> Q. How many times did you attempt to contact Ms. Kaminski or somebody from OCY from your release in 2019 until now?
>
> A. One, two, three, four — at least six or seven attempts. I have paperwork that I even had faxed. I called her supervisor and left a message and asked for her to call me back. At the time, I didn't have a phone. But I had left a reliable number, my doctor's number. My doctor had called, too. And she talked to him. She never called back.
>
> Q. Did you ever call her back after that?
>
> A. I did one time after that. And I'm trying to think. That was about September. That was September. Yeah, that was the last time I tried getting ahold of her. And it wasn't even for [the Children]. It was for my older son because she told me I could have no contact with my two younger sons.[9]

---

[9] The certified record before this Court indicates that Mother had older children, but it does not identify how many older children or their ages. **See** N.T., 3/22/21, at 24.

N.T., 3/22/21, at 69-70. To the extent that the orphans' court credited Kaminski's testimony that, after the Children were adjudicated dependent on May 29, 2018, Mother only contacted her on July 16, 2020, we do not disturb those findings.

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(1) where Mother has failed to perform any parental duties since her incarceration in 2013. Indeed, Mother has showed no more than a passive interest in the Children's development. Further, Mother has shown no firmness in declining to yield to obstacles in maintaining a relationship with the Children both in and out of prison. Finally, our independent review of the certified record reveals no non-frivolous issues that would support Mother's appeal from the termination decrees under Section 2511(a)(1).

We next review the court's finding that termination of Mother's parental rights serves the Children's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b). We have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider

the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (some punctuation omitted). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

In this case, there is no evidence of a parent-child bond between Mother and the Children. Rather, the record reveals that a parental bond exists between the Children and their foster parents. Kaminski testified, "Their bond [with the foster parents] is great. The [C]hildren are . . . really happy. And the foster parents are very loving and nurturing. The [C]hildren look to them as parents." *See* N.T., 3/22/21, at 36. Further, she testified on direct examination:

> Q. How would you assess that [the Children have] done just emotionally, psychologically, educationally since they've moved to the [foster parents' home] in July of 2020?
>
> A. I think they are thriving. I think they are doing really well. The [foster parents] are on it. They are dedicated to ensuring that they receive the best education and the best mental health services, anything to make sure that those boys are doing well[.]

*See id.* at 47. Kaminski testified it is in the Children's best interests that Mother's parental rights be terminated, and it will not cause them irreparable harm. *See id.* at 37.

K.D., the foster mother, testified that the Children have resided in her home with her husband and her father since July 3, 2020. *See* N.T., 3/22/21, at 49, 59. She described her relationship with the Children in detail, the services they receive, and their academic progress. *See id.* at 51-57. K.D. testified that she and her husband desire to adopt the Children. *See id.* at 60. She testified that she loves them, and that the Children tell her every day that they love her. *See id.*

We discern no abuse of discretion by the court in concluding that termination serves the Children's developmental, physical, and emotional needs and welfare. Our independent review of the certified record reveals no non-frivolous issues that would support Mother's appeal from the termination decrees under Section 2511(b). Accordingly, we grant Counsel's petition to withdraw from representation, and affirm the decrees terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decrees affirmed. Counsel's petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/19/2022